UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

BEN BRINKMANN, HANK BRINKMANN,                Civil Action No. 2:21-cv-02468
and MATTITUCK 12500 LLC.,

                         Plaintiffs,            **COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

               -against-             <u>Jury Trial Demanded</u>

TOWN OF SOUTHOLD, NEW YORK,

                   Defendant.
---------------------------------------------------------------X

     Plaintiffs BEN BRINKMANN, HANK BRINKMANN, and MATTITUCK
12500 LLC., by their attorneys, the Institute for Justice, complaining of the
defendant, respectfully allege as follows.

## Introduction

     1.    This is a Fifth Amendment lawsuit challenging the Town of Southold's
attempt to seize private property from Plaintiffs ("the Brinkmanns"), via eminent
domain, for the specific purpose of preventing the Brinkmanns from building and
operating a lawful business that satisfies all zoning and other regulatory
requirements.

     2.    The Town's *stated* purpose for the taking is the creation of a small
public park, but this is a pretext concealing the actual purpose. The Town did not
contemplate a park, much less engage in any planning for a park on the
Brinkmanns' property, until after they applied for a building permit, and after the

Town had exhausted every other regulatory avenue in its attempt to stop the Brinkmanns from obtaining a building permit. The Town has made no effort to purchase a larger parcel next door that is for sale and equally suitable for a small park.

3.     Eminent domain must be used for a public use. And the government's asserted public use must be the actual reason for using eminent domain. When, as here, the government uses eminent domain for an illegitimate reason—just to halt a lawful business—and uses a park as a pretext to justify that taking, the exercise of eminent domain is unconstitutional.

4.     Brinkmann's Hardware is a Long Island-based, family-owned business. The Brinkmanns want to open a new hardware store on an approximately 1.75-acre parcel (the "Property") they own along the main thoroughfare through the Hamlet of Mattituck in Southold (12500 NYS Route 25 (SCTM# 1000-114.-11-17)).

5.     The Town's government, however, does not want Brinkmann's Hardware in their Town. So, the Town has used every tool at its disposal to try and stop the Brinkmanns. The Town has insisted that the Brinkmanns pay exorbitant fees for impact studies, but they paid up. The Town has imposed a (selectively enforced) moratorium on all new building permits along the main thoroughfare where the Property is located, but the Brinkmanns sued to end the moratorium. The Town even tried to induce Bridgehampton National Bank to breach its contract for the sale of the Property to the Brinkmanns, with the Town Supervisor vowing that Brinkmann's Hardware would never open there.

6.      Lacking any legitimate reason to stop the Brinkmanns from building its new location, which Plaintiffs are entitled to do as a matter of right on the commercially zoned Property, the Town has now authorized seizing the Brinkmanns' land through eminent domain, ostensibly for a park.

7.      This is a sham. The Town had never previously considered putting a park on this land; the only reason it is doing so now is to stop the Brinkmanns from opening a store on the land it owns.

8.      State and federal courts around the country have recognized that takings are unlawful when the government's stated purpose is a mere pretext for some other, illegitimate purpose. And one such illegitimate purpose is to prevent property owners from making entirely lawful uses of their property.

9.      The Brinkmanns filed this lawsuit seeking: (1) a declaration that the sham public-use determination for the Town's pretextual park violates the Fifth Amendment's public-use requirement; and (2) an injunction preventing the Town from acquiring the Property using eminent domain based on the invalid public-use determination at issue here or any similarly invalid declaration in the future.

**Parties**

10.     Plaintiffs Ben and Hank Brinkmann are residents of the State of New York.

11.     Ben and Hank are the sole owners of Plaintiff Mattituck 12500 LLC, which is organized and in good standing under the laws of the State of New York. Mattituck 12500 LLC owns the Property in the Hamlet of Mattituck, which is a

3

neighborhood within Southold, New York. The Property's address is 12500 NYS
Route 25, and it is located at the northeast corner of New Suffolk Avenue and Route
25 in the Hamlet of Mattituck (SCTM# 1000-114.-11-17). The Property is the
subject of this litigation.

12.     Defendant Town of Southold is a municipal corporation organized
under the laws of the State of New York.

## Venue and Jurisdiction

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C.
§§ 1331, 1343, 2201, 2202, and 42 U.S.C. § 1983.

14.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## Factual Allegations

15.     Brinkmann's Hardware is a small, family-owned and -operated
business that has operated on Long Island since 1976.

16.     In 1976, Tony and Pat Brinkmann opened the first Brinkmann's
Hardware store in Sayville, New York. At the time, the store was only 1,200 square
feet.

17.     Since then, the business has expanded to four locations on Long Island:
Blue Point, Holbrook, Miller Place, and the original (now flagship) location in
Sayville.

18.     Tony and Pat have since retired, and their children, Mary, Ben, and
Hank now run the stores. (Mary is not directly involved with the planned Southold
store.)

19.    Brinkmann's Hardware stores are mid-sized neighborhood hardware stores, the type of which has been a staple of American main streets for generations.

20.    The Brinkmanns have proven that small hardware stores can still compete with big box stores like Home Depot. They do this by prioritizing customer service and convenience. They strive to always build stores in the downtown area, and on well-exposed corners (like the Property in Mattituck) whenever possible. Customers value Brinkmann's convenient locations, knowledgeable staff, and competitive prices.

21.    Ben and Hank Brinkmann understand that the success of their stores is highly dependent on the stores' locations. A Home Depot can open anywhere, and people will drive long distances to get to it, but a neighborhood hardware store has to be convenient.

22.    Ben and Hank know Long Island well, and they are always on the lookout for possible locations for new stores, but ideal locations are scarce.

23.    In 2011, Ben and Hank discovered a vacant lot for sale that they thought would be perfect for a new store. It is 1.7 acres, commercially zoned, undeveloped, and located on a main street corner in the Town of Southold.

24.    In 2011, however, the Brinkmanns were not in a financial position to acquire the Property and build a new store.

25.    In 2011, Bridgehampton National Bank, which intended to build a new branch on the location, bought the Property.

26.    In 2011, when the Property was for sale, the Town never made any

effort to acquire the Property and did not have any plans for a park on the Property.

27.     The bank never built a new branch on the Property because it moved into an existing building in town that unexpectedly became available.

28.     The bank held the Property until 2016, when Brinkmann's was able to expand. Ben and Hank approached the bank about buying the Property, and the bank agreed. They contracted to purchase the lot for $700,000 on December 2, 2016.

29.     In 2016, when the bank sold the Property to the Brinkmanns, the Town made no effort to acquire the Property and had no plans for a park on the Property.

30.     The Brinkmanns' purchase agreement with Bridgehampton contained a due-diligence period to ensure that the Brinkmanns would, in fact, be able build a store on the location.

31.     Upon signing the contract, Ben and Hank immediately started meeting with Town officials and other stakeholders to move the project forward through permitting and zoning review, and then to construction.

32.     One of the first things that Ben and Hank did in 2017 was discuss their plans with the owner of the one existing hardware store in Mattituck, Rich Orlowski. Ben and Hank proposed buying out Orlowski's existing business. Orlowski and the Brinkmanns agreed that, when the new Brinkmann's location opened, Orlowski would close his store for a lump sum payment of the value of his inventory as of the date he closed his business (believed to be approximately $350,000), and that he would be hired as the manager of the new Brinkmann's

location.

33.     In April 2017, the Brinkmanns engaged a local architect, Nemschick

Silverman Architects P.C., to conduct a feasibility study and draw up site plans.

34.     The contract provided that the new hardware store should "match the

surrounding neighborhood design aesthetic."

35.     The Brinkmanns met with the Southold Town Planning Department in

May 2017, to inform them of their plans for a new location.

36.     During the May 2017 meeting with the Planning Department,

Southold planning officials did not state that the Town had plans for a public park

on the Property.

37.     Planning officials did not state during the May 2017 meeting that the

Town had plans for a public park on the Property because the Town did not have

any such plans.

38.     The Brinkmanns also held two meetings with the Mattituck-Laurel

Civic Association. First, they met with just the leadership of the Association in July

2017, and Orlowski attended that meeting to help introduce the plan and to

demonstrate that he was working with the Brinkmanns. Then they held an open

meeting in September 2017.

39.     The open meeting was attended by Southold Town Supervisor Scott

Russell and at least two councilmembers. At the meeting, some residents expressed

concern about the impact that the proposed store would have on traffic at the

intersection.

40.    At the meeting, Ben and Hank Brinkmann promised that they would pay for whatever intersection improvements might be deemed necessary by traffic studies.

41.    After the meeting, Supervisor Scott Russell wrote: "I give credit to the applicant for his willingness to walk into the lion's den. From my perspective, a great deal of concern is the impact on traffic and the overall impact on safety. That is an over-riding concern on all applications in that area. That is very understandable."

42.    A traffic study was ultimately completed in September 2020, and nothing in the study indicated that the proposed hardware store would cause traffic problems.

43.    At no point during the July or September 2017 meetings with the Mattituck-Laurel Civic Association did either Town Supervisor Russell or anyone else state that the proposed Brinkmann's location on the Property conflicted with existing Town plans to build a public park on the Property.

44.    No one stated during the July or September 2017 meetings that the proposed Brinkmann's location conflicted with existing Town plans to build a public park on the Property because no such plans existed.

45.    The Brinkmanns shared the site plans with the Town Planning Department prior to submitting a formal application. The Plans went through two rounds of revisions based on those discussions.

46.    In January 2018, the Brinkmanns filed their first permit application

with the Town Building Department. This application contained the third version of the site plan, which had been revised based on prior discussions with Town officials. *See* Southold Code § 144-8.

47.     That application was denied by the Town Building Department in March 2018, because no site plan had been approved by the Planning Department.

48.     In denying the January 2018 permit application, planning officials did not state that the proposed Brinkmann's location conflicted with existing Town plans to build a public park on the Property.

49.     In denying the January 2018 permit application, planning officials did not state that the proposed Brinkmann's location conflicted with existing Town plans for a public park on the Property because no such plans existed.

50.     In April 2018, the architects completed their designs for the Property depicting a 12,000 square-foot hardware store, a 3,000 square-foot paint store, 5,000 square feet of storage, and 80 parking spaces. As requested by the Planning Department, this version of the plan depicted the buildings abutting the main road, with parking behind.

51.     In May 2018, the Brinkmanns and the architects attended a preliminary planning meeting with the town Planning Department and applied for site-plan approval.

52.     In June 2018, the Town notified the Brinkmanns that the project required a "Special Exception Permit," with a $1,000 application fee, because the planned store would be over 6,000 square feet.

53.    The Town's ordinances contain a lengthy list of objective requirements for stores over 6,000 square feet. These requirements address issues including setbacks, architectural style, building materials, parking, and signage. *See* § 280-45(B)(10).

54.    The Brinkmanns' plans addressed all of these requirements, and they were prepared to modify their plans further based on feedback from the Planning Board.

55.    Another requirement to build a store over 6,000 square feet is that the Planning Board is required to conduct a "Market and Municipal Impact Study," to determine that the proposed store will not have an adverse impact on various aspects of the local economy. § 280-45(B)(10)(b). In June 2018, the Town notified the Brinkmanns that the project required such a study, with a fee to be determined.

56.    In notifying the Brinkmanns in June 2018 that they needed to complete a "Market and Municipal Impact Study," planning officials did not notify the Brinkmanns that their proposed hardware store conflicted with existing Town plans for a public park on the Property.

57.    In notifying the Brinkmanns in June 2018 about the "Market and Municipal Impact Study," planning officials did not state that the proposed Brinkmann's location conflicted with existing Town plans for a public park on the Property because no such plans existed.

58.    In the summer of 2018, Orlowski changed his attorney, hiring the former Town attorney, Martin Finnegan.

59.     Mr. Finnegan contacted the Brinkmanns on July 10, 2018, to inform them that he represented Mr. Orlowski. And on July 24, 2018, Finnegan again contacted the Brinkmanns to inform them that Orlowski was "renegotiating the agreement" and demanding double the price, $700,000, to buy out Orlowski's hardware store.

60.     On July 31, 2018, the Town notified the Brinkmanns that the fee for the Impact Study would be $30,000.

61.     In notifying the Brinkmanns in July 2018 that the study fee would be $30,000, planning officials did not inform the Brinkmanns that their proposed hardware store conflicted with existing Town plans for a public park on the Property.

62.     In notifying the Brinkmanns in July 2018 that the study fee would be $30,000, planning officials did not inform the Brinkmanns that their proposed hardware store conflicted with existing Town plans for a public park on the Property, because no such plans existed.

63.     By this time, it was becoming increasingly clear to Ben and Hank that the Town was deeply opposed to them opening the new store.

64.     Three days after the Town informed the Brinkmanns they would have to pay the Impact Study fee, Mr. Finnegan again wrote to the Brinkmanns on August 2, 2018, and told them Orlowski had reduced the demand for his hardware store business to $450,000, indicating that the Brinkmanns needed to pay up to "eliminate . . . insurmountable hurdles" that the Brinkmanns were facing with

permitting because "upgrading your status to the existing local hardware store should shed a favorable light on your application."

65.     Upon information and belief, Mr. Finnegan, the former Town Attorney, had personal knowledge of the Town's evaluation of the Brinkmanns' permit application at the time he was representing Mr. Orlowski and renegotiating the sale of Orlowski's hardware store in Southold.

66.     The Brinkmanns rejected both offers that Mr. Finnegan presented: the $700,000 offer for Orlowski's hardware store business that Finnegan made on July 24, 2018, and the offer Finnegan made on August 2, 2018, for the reduced amount of $450,000, which Finnegan communicated alongside a reference to how acceptance may affect the Brinkmanns' then-pending permit application with the Town.

67.     In September 2018, the Town Board voted to try to buy the Property from the Brinkmanns.

68.     The Town voted to try to purchase the Property in September 2018 for the sole and specific purpose of stopping the Brinkmanns from building and operating their proposed location at the Property.

69.     Prior to the September 2018 vote to try to purchase the Property, the Town had not engaged in any planning for a public park on the Property; had not tasked any Town committee with evaluating the possibility of a new public park on the Property; had not tasked any Town planning staff with evaluating the possibility of a new public park on the Property; had not conducted any financial analyses of creating a new park on the Property; had not evaluated any alternative

location for a new public park somewhere other than the Property (including, for example, the possibility of purchasing the undeveloped land for sale next to the Property); had not surveyed Town citizens or held stakeholder meetings with citizens about purchasing the Property for a new park; had not conducted any geotechnical survey of the Property to determine its suitability for a public park; had not held any public hearings about creating a new public park on the Property; had not retained any outside consultants to evaluate the Property as a location for a new public park; and had not retained any architects, contractors, traffic engineers, or landscapers to evaluate the Property or design and build a new park on the Property.

70.    No public records indicate that the Town was previously considering that land for a park until the Brinkmanns decided to open a hardware store there.

71.    The Town never attempted to purchase the Property when it was for sale in 2011.

72.    The Town never attempted to purchase the Property from its 2011 buyer, Bridgehampton National Bank, until after the Brinkmanns had already contracted to purchase the property and had applied for a permit to build their store.

73.    The Town did not approach Bridgehampton National Bank to purchase the Property after the bank decided not to develop it.

74.    There is also an undeveloped plot of land next door to the Property that, at the time of this filing, is for sale and which would be equally suitable for a

park, but which the Town has never considered acquiring.

75.    In October 2018, the Town took more drastic measures, attempting to interfere with the Brinkmanns' purchase contract for the vacant lot. Scott Russell, the Southold Town Supervisor, called the president of Bridgehampton National Bank, Kevin O'Connor. Russell pressured O'Connor not to sell the property to the Brinkmanns. He suggested that O'Connor instead sell to the Town. O'Connor responded that he would proceed with the sale as contracted, to which Russell responded, "I will never allow anything to be built on that property."

76.    When Town Supervisor Russell called the president of Bridgehampton National Bank to demand that the bank breach its real-estate contract with the Brinkmanns and not close on the Property, he did not state that the Town had plans to build a park on the property because there were no Town plans for a park and the Town had no actual desire for a Park. The Town's only objective was to stop the Brinkmanns.

77.    O'Connor called Ben and Hank to tell them about this conversation with the Town Supervisor.

78.    Later, the Assistant Town Attorney, Damon Hagan, called Bridgehampton Bank's attorney, Vincent Candurra, and similarly pressured Bridgehampton to back out of the sale contract with the Brinkmanns.

79.    Ben and Hank were undeterred, and they closed on the Property on November 20, 2018.

80.    At the closing, Candurra told the Brinkmanns about the call he

received from Hagan. Candurra told the Brinkmanns he was "put off" by the threatening and inappropriate nature of the call.

81.   In January 2019, the Brinkmanns paid the Town $30,000 for the impact study that the Town's Planning Board required.

82.   The pending permit application required no zoning changes, no waivers, and no discretionary variances. The plans for the store complied with all of the other requirements for a square footage exemption, and Ben and Hank believed that by paying the fee for the impact study, they could finally force the Town to act on their application.

83.   A few weeks after the Brinkmanns paid the $30,000 impact-study fee, the Town enacted a six-month moratorium on any new building permits along the main thoroughfare where the Property is located. The moratorium was limited in geographic scope: It covered only a one-mile stretch of road, and it was centered on the Brinkmanns' property.

84.   The Town also offered to refund the $30,000, but the Brinkmanns refused, knowing that accepting the refund would make their application incomplete.

85.   During the six weeks between the time the Brinkmanns paid the Town $30,000 for the market impact study on January 9, 2019, and when the Town enacted the permit moratorium on February 26, 2019, the Town failed to perform any work on the market study despite it being legally required to complete that study within 90 days, Town of Southold City Code § 280-45(B)(10)(b). Nor did the

15

Town retain the outside consultant it had previously identified in July 2018 "to conduct this study" (Nelson, Pope, and Voorhis), when demanding that the Brinkmanns pay a fee of $30,000 "to cover the cost of this study."

86.    Notwithstanding that the Town was required by law to complete the impact study within 90 days, the Town has, to date, taken no action to even begin the study.

87.    The Town's permit moratorium concerned only the approval and issuance of permits; it did not excuse the Town from processing the Brinkmanns' application, nor did the Town's moratorium waive any of the Town's legal obligations related to the deadlines by which it had to complete the market study it required from the Brinkmanns.

88.    Exasperated, the Brinkmanns sued the Town in state court in May of 2019, challenging the moratorium. That litigation is ongoing.

89.    The Town has twice extended the moratorium, first in August 2019, then in July 2020.

90.    Each time it sought to extend the permit moratorium, the Town submitted a "local law" referral to the Suffolk County Planning Commission. In response, Suffolk County requested evidentiary support for extending the moratorium and the Town failed to provide it.

91.    When the Town made a "local law" referral to Suffolk County concerning the first extension of its permit moratorium, the County's staff recommended "disapproval" because the Town's bare assertions for needing the

moratorium lacked evidentiary support. Rather than reject the referral, Suffolk County's Planning Commission deemed it "incomplete" and requested that the Town provide traffic studies and relevant sections of the Town's comprehensive plan. The Town ignored this request.

92.     When the Town sought a second extension of its moratorium and sent a "local law" referral to the Suffolk County Planning Commission, the County produced a report noting that the Town of Southold never provided the County with the supporting evidence it requested for the Town's first extension. Thus, for this second extension, Suffolk County staff again recommended that the moratorium be "disapproved" because there were no findings that (1) "indicate how serious or urgent these circumstances are"; (2) "there are no other alternatives, less burdensome on property rights than the moratorium"; and (3) "there are no findings that indicate why the existing land use ordinances are not adequate."

93.     During this time, the Town has selectively enforced the moratorium, granting building permits to parties other than the Brinkmanns.

94.     Upon information and belief, the Town has granted at least three waivers to the moratorium: (1) Wickham Road LLC, owner of 12800 Main Road, Matittuck, received a waiver to obtain a variance to turn a vacant building into offices; (2) Abigail A. Wickham as agent for 11155 Main Road LLC, property location at 11155 Route 25, Mattituck, received a waiver for internal renovations and a handicap ramp; and (3) Patricia C. Moore as agent for Love Lane Village LLC, property location at 13650 Main Road, Mattituck, received a waiver for

17

interior and exterior work including the addition of solar panels.

95.     The Brinkmanns did not apply for a waiver to the moratorium because they believed it would have been futile, as the moratorium was clearly targeted at their proposed hardware store.

96.     The building moratorium was specifically intended to stop the Brinkmanns, as it was imposed shortly after their application became complete, and it has been selectively waived for parties other than the Brinkmanns despite those properties being located on the same main thoroughfare where the Brinkmanns' Property is located.

97.     The fact that applications were being processed during the moratorium further emphasizes that the moratorium was designed to stop the Brinkmanns. Applications were being processed during the moratorium, but not the Brinkmanns' application. This is despite the fact that the Brinkmanns submitted a complete application, paid $30,000 for an impact-study fee, and the Town was required to complete its evaluation of "undue adverse impact" within 90 days from the submission of that fee, and also vote on that determination 30 days after conducting that evaluation. Town of Southold City Code § 280-45(B)(10)(b). In sum, the Town was required to act on the Brinkmanns' application and it did not, even though it acted on other applications.

98.     The vacant property next door remains for sale, and the Town did not consider that land's suitability for a park.

99.     On June 22, 2020, the trial court in the Brinkmanns' state court

18

lawsuit denied the Town's motion to dismiss, allowing their challenge to the moratorium to proceed.

100.    Soon thereafter, in July 2020, the Town held a public legislative hearing, as required by New York law, to determine whether a park on the Property would constitute a public use for purposes of eminent domain. N.Y. Em. Dom. Proc. Law § 203.

101.    In September 2020, the Town issued its formal "findings and determinations," in which the Town concluded that acquiring the Brinkmanns' land for a park would indeed be a public use. *Id.* at § 204; *see also* Resolutions 2020-571 & 2020-572, https://perma.cc/698V-JA3B.

102.    In September 2020, the Town authorized the acquisition of the Brinkmanns' Property via eminent domain, for the ostensible purpose of building a "passive use park," *i.e.*, a park with no significant facilities or improvements.

103.    On September 19, 2020, in a guest column in the Suffolk Times, Southold Town Board member Sarah Nappa confirmed that the Town's true objective in using eminent domain was not to establish a park, but rather to stop the Brinkmanns from building a hardware store on their land.

104.    Ms. Nappa wrote: "I can't help but wonder, if this application had been filed by anyone but an outsider, if this business was owned and operated by a member of the 'old boys club,' would the town still be seizing their private property? The use of eminent domain by Southold Town to take private property from an owner because it doesn't like the family or their business model is a dangerous

precedent to set."

## Injury to Plaintiffs

105.    The Town's declaration of public use has injured Plaintiffs Ben and Hank Brinkmann, and 12500 Mattituck LLC (through which they own the property) because, under the Takings Clause of the Fifth Amendment, the public-use determination is a sham, the asserted public park justification for the taking of Plaintiffs' property is a pretext, and this unconstitutional public-use determination is the basis of the Town's intended condemnation of the Property.

106.    Unless Plaintiffs invalidate the pretextual public-use determination in federal court, they will lose the Property to the Town in a state-court condemnation proceeding.

107.    Plaintiffs are further injured in that, under New York law, they would not be permitted to raise a public-use defense in that state-court condemnation proceeding. N.Y. Em. Dom. Proc. Law § 204.

108.    Plaintiffs are further injured in that their only opportunity to challenge public use in the New York courts was by filing an affirmative lawsuit challenging the sufficiency of the administrative record from the public hearing in supporting the Town's legislative Determination and Findings of public use. The deadline to file such an action is thirty days after the determination, which has long since expired. N.Y. Em. Dom. Proc. Law § 207(A).

109.    Plaintiffs are further injured in that, even if the 30-day statute of limitations had not already expired, New York's Eminent Domain Procedure Law

authorizes state courts to review only the sufficiency of the administrative record. N.Y. Em. Dom. Proc. Law § 207. Discovery is not allowed. Yet, because Plaintiffs allege that the asserted justifications on the face of the administrative record are a sham, the only way for them to establish that the public-use determination was pretextual and unconstitutional is by engaging in discovery to prove the actual illegitimate purpose. In short, the specific Fifth Amendment claim that Plaintiffs have brought in federal court is a claim that they could never have brought in state court.

110.    For the purposes of New York state law and the state courts of New York, the taking of the Property for a public park has been conclusively deemed a public use. Under the Eminent Domain Procedure Law, Plaintiffs have no ability to file an affirmative lawsuit in state court asserting their rights under the Fifth Amendment and they are not permitted to raise the Fifth Amendment as a defense in any state-court lawsuit that the Town files against them to obtain legal title to the Property and determine just compensation for Plaintiffs. N.Y. Em. Dom. Proc. Law §§ 204, 207(A), 208.

111.    A property owner whose land is the subject of a legislative public use determination in New York has a ripe claim in federal court under the Fifth Amendment and 28 U.S.C. § 1983. *See Goldstein v. Pataki*, 516 F.3d 50, 54 n.2 (2d Cir. 2008).

112.    Now that the Brinkmanns have paid all of the required fees and have demonstrated that they will not be deterred by the building moratorium, eminent

domain is the Town's best prospect of stopping the Brinkmanns, which Town Supervisor Scott Russell has promised he will do.

113.    Although the Town has not yet granted—or even acted on—the Brinkmanns' application for a square footage exemption, the Brinkmanns' plans meet all of the requirements for an exemption, and they are willing to modify the plans to the extent necessary, should the Planning Board determine that any of the specified requirements are not satisfied by the current plans.

114.    The Town has taken concrete steps towards taking the Brinkmanns' property, and this lawsuit is the Brinkmanns' only opportunity to litigate this federal constitutional issue: whether the Fifth Amendment allows a taking whose stated purpose is a mere pretext for preventing people from making a lawful use of their property.

115.    The Brinkmanns are also injured by the public use determination because, as long as eminent domain appears to be a viable option for the Town, the Brinkmanns will never be granted a permit or be allowed to start building its store. And the longer this saga drags on, the more money they will have to spend and the more capital they will have tied up, not earning any return.

116.    The Brinkmanns are also injured by the determination that the taking of their land is for a public use and the cloud of pending condemnation that it places over their property, which also puts any investments into the Property in jeopardy.

**Count One: Fifth Amendment Pretextual Taking**

117.    All previous allegations are reincorporated here as if set out in full.

118.   The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation."

119.   A taking is not for a legitimate public use when the government's stated purpose is a mere pretext for some other, illegitimate purpose.

120.   One such illegitimate purpose is to stop property owners from putting their property to uses that are entirely lawful and consistent with existing regulations.

121.   When the circumstances surrounding a condemnation raise a strong inference that the government is acting for an improper purpose, searching judicial scrutiny is required.

122.   The Town of Southold had never previously considered the Brinkmanns' land for a park. It made no effort to acquire the land when it was for sale in 2011, nor did it approach the bank about buying it until after the Brinkmanns were under contract and had applied to build their hardware store.

123.   None of the Town's long-term planning documents discussed turning the Brinkmanns' property into a park.

124.   The Town's proposed park is nothing but a pretext to stop the Brinkmanns from opening a lawful business on their own land. As such, this taking does not satisfy the public use requirement of the Fifth Amendment.

## Relief Requested

A.   A declaratory judgment by the Court that the Town of Southold's stated purpose of acquiring the Plaintiffs' property to open a public park is a mere

pretext for the illegitimate objective of halting an entirely lawful use of property by its owners, and that such a taking violates the Fifth Amendment to the United States Constitution;

B.    Permanent injunctive relief prohibiting Defendant Town of Southold from acquiring the Property using eminent domain based on the invalid public-use determination at issue here or any similarly invalid declaration in the future;

C.    An award of attorneys' fees, costs, and expenses in this action;

D.    An award of nominal damages in the amount of $1 to each Plaintiff; and

E.    Any other legal or equitable relief to which Plaintiffs may show themselves to be justly entitled.

Dated this 4th day of May, 2021.

Respectfully Submitted,

/s/ William Aronin
William Aronin (EDNY No. WA0685)
Jeffrey Redfern*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: waronin@ij.org
Email: jredfern@ij.org

Arif Panju*
INSTITUTE FOR JUSTICE
816 Congress Ave, Suite 960
Austin, TX 78701
Phone: (512) 480-5936
Fax: (512) 480-5937
Email: apanju@ij.org

24

Counsel for Plaintiffs
* Pro Hac Vice Applications forthcoming