UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

BEN BRINKMANN, HANK BRINKMANN, and
MATTITUCK 12500 LLC.,

                              Plaintiffs,

                v.

TOWN OF SOUTHOLD, NEW YORK,

                             Defendant.

**MEMORANDUM AND ORDER**
21-CV-2468 (LDH)

---

LaSHANN DeARCY HALL, United States District Judge:

       Ben Brinkmann, Hank Brinkmann, and Mattituck 12500 LLC ("Plaintiffs") bring this action against the Town of Southold, New York ("Defendant") pursuant to 42 U.S.C. § 1983 alleging a "pretextual taking" in violation of the Takings Clause of the Fifth Amendment of the United States Constitution. Defendant moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint in its entirety.

### BACKGROUND[1]

      Ben and Hank Brinkmann are brothers who, along with their sister, Mary Brinkmann, run a chain of four midsize hardware stores in Long Island. (Compl. ¶¶ 15–19, ECF No. 1.) In 2011, Plaintiffs set their sights on a vacant lot in Southold, New York, for expansion of their business, but Bridgehampton National Bank purchased the lot before Plaintiffs could purchase it. (*Id.* ¶¶ 23–25.) On December 2, 2016, after declining to develop the property, the bank contracted with Plaintiffs to sell the lot for $700,000. (*Id.* ¶ 28.) The purchase contract included a due diligence provision to allow Plaintiffs to ensure that they could develop the lot prior to

---

[1] The following facts are taken from the complaint and are assumed to be true for the purpose of this memorandum and order.

finalizing the purchase, so Plaintiffs immediately began planning. (*Id.* ¶ 30–31.) Plaintiffs allege, however, that Defendant thwarted their efforts at every turn.

After agreeing to buy out a local Southold hardware store and engaging an architect to draw up site plans that would match the surrounding neighborhood design aesthetic, Plaintiffs met with the Southold Town Planning Department in May 2017 to discuss their plans. (*Id.* ¶ 32–35.) In September 2017, Plaintiffs held a public meeting with the Mattituck-Laurel Civic Association attended by Southold Town Supervisor Scott Russell and "at least two councilmembers." (*Id.* ¶¶ 37–39.) At the public meeting, residents expressed concern about traffic near the proposed store. (*Id.* ¶ 40.) Supervisor Russell summarized the concerns after the meeting, noting that increased traffic was a problem for all applicants in the property area. (*Id.* ¶ 41.) Plaintiffs promised to pay for any intersection improvements deemed necessary by traffic studies. (*Id.* ¶ 40.) A traffic study conducted in September 2020 revealed that the proposed store would cause no traffic problems. (*Id.* ¶ 42.)

In January 2018, after twice revising their site plans based on meetings with the Town Planning Department, Plaintiffs filed their first permit application with the Town Building Department. (*Id.* ¶¶ 45–46.) The application was denied in March 2018 because the Town Planning Department did not approve the site plan. (*Id.* ¶ 47.) In May 2018, after revising the site plan for the third time, Plaintiffs again applied for site-plan approval. (*Id.* ¶¶ 50–51.) The following month, Defendant notified Plaintiffs that their plan required a special exception permit because the planned store was more than 6,000 square feet. (*Id.* ¶ 52.) Plaintiffs paid a $1,000 fee to submit the application. (*Id.*) Defendant also informed Plaintiffs that the Planning Board would have to conduct a "Market and Municipal Impact Study," at Plaintiffs' expense, to determine adverse impacts on the local economy. (*Id.* ¶ 55.)

In July 2018, the owner of the local hardware store who had agreed to sell it to Plaintiffs, doubled the purchase price. (*Id.* ¶ 59.) The store owner had retained Martin Finnegman, who was the former Town attorney. (*Id.*) Also, in July 2018, Defendant informed Plaintiffs that the fee for the Market and Municipal Impact Study would be $30,000. (*Id.* ¶¶ 60.) Three days later, Finnegan wrote to Plaintiffs and lowered the purchase price for the local hardware store. (*Id.* ¶ 64.) He "indicat[ed] that [Plaintiffs] needed to pay up to 'eliminate . . . insurmountable hurdles' that [Plaintiffs] were facing with permitting because 'upgrading [their] status to the existing local hardware store should shed a favorable light on [their] application.'" (*Id.*) "Upon information and belief," Plaintiffs allege that Finnegan had personal knowledge of Defendant's evaluation of their permit application while he was renegotiating the hardware store sale. (*Id.* ¶ 65.) Plaintiffs rejected both offers. (*Id.* ¶ 66.)

In September 2018, Defendant voted to purchase the property, and in October 2018, the Town Supervisor called the president of Bridgehampton National Bank to ask that they sell the property to Defendant and not Plaintiffs. (*Id.* ¶¶ 67–68, 75.) After the bank president refused, the Town Supervisor responded that he would "never allow anything to be built on that property." (*Id.* ¶ 75.) Later, the Assistant Town Attorney called the bank's attorney to pressure it to back out of the contract with Plaintiffs. (*Id.* ¶ 78.) Undeterred, Plaintiffs closed on the property on November 20, 2018. (*Id.* ¶ 79.)

In January 2019, Plaintiffs paid the impact study fee, but, a few weeks later, Defendant enacted a six-month moratorium on building permits in a one-mile geographic area where their property was located. (*Id.* ¶¶ 81, 83.) Defendant offered Plaintiffs a refund for the fee, but Plaintiffs declined. (*Id.* ¶ 84.) Defendant extended the moratorium in August 2019 and again in July 2020, despite each moratorium application "lack[ing] evidentiary support." (*Id.* ¶¶ 89–92.)

During the moratorium, Defendant granted at least three waivers to those who applied for them. (*Id*. ¶ 94.) Plaintiffs, however, did not apply because they believed doing so would be futile. (*Id*. ¶ 95.)

In July 2020, Defendant held a public hearing pursuant to New York Eminent Domain Procedural Law to determine whether a park on Plaintiffs' property constituted a public use, and in September 2020, Defendant issued formal findings and determinations concluding that it did. (*Id*. ¶¶ 100–01.) The same month, Defendant authorized the acquisition of Plaintiffs' property for a "passive use park." (*Id*. ¶ 102.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id*. While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).

## DISCUSSION

Eminent domain is "'a fundamental and necessary attribute of sovereignty, superior to all private property rights' . . . . [b]ut the Fifth Amendment ensures[] this power is not without

limits[.]" *Goldstein v. Pataki*, 516 F.3d 50, 57 (2d Cir. 2008) (quoting *Rosenthal & Rosenthal, Inc. v. N.Y. State Urban Dev. Corp.*, 771 F.2d 44, 45 (2d Cir. 1985)). The Fifth Amendment provides, in relevant part, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V ("Takings Clause").[2] The Takings Clause guarantees that "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." *Goldstein*, 516 F.3d at 57 (quoting *Thompson v. Consol. Gas Utils. Corp.*, 300 U.S. 55, 80 (1937)). That is, any government taking must be for public use. And, to be sure, the Government may not "take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 479 (2005).

Of course, "[t]he primary mechanism for enforcing the public-use requirement has been the accountability of political officials to the electorate, not the scrutiny of federal courts." *Goldstein,* 516 F.3d at 57. Thus, while there is "a role for courts to play in reviewing a legislature's judgment of what constitutes a public use[,]" that role is "'an extremely narrow one.'" *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984) (quoting *Berman v. Parker*, 348 U.S. 26, 32 (1954)). District courts are "not to 'substitute [their] judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.'" *Goldstein*, 516 F.3d at 58 (quoting *Midkiff*, 467 U.S. at 244). Instead, they are to "patrol[] the borders" of the decision to condemn private property. *Goldstein*, 516 F.3d at 63. "If a legislature, state or federal, determines there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use." *Midkiff*, 467 U.S. at 244.

---

[2] The Supreme Court extended the Takings Clause to the states vis-à-vis the due process clause of the Fourteenth Amendment. *See Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897).

Against this backdrop, it is clear that Plaintiffs have failed to state a claim under the Takings Clause. Plaintiffs do not allege that their property was taken to bestow a private benefit. Nor do Plaintiffs allege that the Town Board failed to follow the procedure provided by New York's eminent domain laws or that the Town Board's findings and determinations concerning whether a park is a "public use" are unsupported. And, Plaintiffs do not, and could not, dispute that building a public park is a public use. *See Rindge Co. v. Los Angeles Cnty.*, 262 U.S. 700, 707–08 (1923) ("[T]he condemnation of lands for public parks is now universally recognized as a taking for public use.").

Nevertheless, Plaintiffs maintain that they need not allege that their property was taken to bestow a private benefit because it is sufficient to allege that the public purpose is pretextual and that the true purpose is to prevent them from expanding their business to Southold. (Pl.'s Opp'n at 4–12, ECF No. 36.) Plaintiffs rely upon the Supreme Court's statement in *Kelo* that the government may not "take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." But that reliance is misplaced. The Second Circuit made clear in *Goldstein* that this single sentence should not be interpreted out of the context in which it was written. The Second Circuit explained that, in fact, *Kelo* affirmed the "longstanding policy of deference to legislative judgments in this field." *Goldstein*, 516 F.3d at 61 (citation omitted). *Kelo* posed a "novel" issue because the legislature took property and gave it to a private party purely for economic development, and not, as had been blessed in the past, to remove blight. *Id*. In other words, the Supreme Court approved a taking that appeared to directly violate the Public Use Clause's prohibition on taking from person A to benefit person B. Indeed, Justice O'Connor stated in her dissent, "private property is now vulnerable to being taken and transferred to another private owner, so long as it might be upgraded . . . in the

6

process[,]" which "wash[ed] out any distinction between private and public use of property." *Kelo*, 545 U.S. at 494 (O'Connor, J. dissenting). This apparent expansion of eminent domain necessitated the "pretext" limitation, one that Justice Kennedy took even further in his concurrence: "[T]ransfers intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits, are forbidden by the Public Use Clause." *Id*. at 490 (Kennedy, J. concurring). Plaintiffs' implicit argument that the Supreme Court "sought *sub silentio* to overrule *Berman*, *Midkiff*, and over a century of precedent" to make the so-called "pretext doctrine" applicable in situations other than those involving a taking for purely economic development, is simply incorrect. *Goldstein*, 516 F.3d at 62. Courts are still prohibited from "giv[ing] close scrutiny to the mechanics of a taking rationally related to a classic public use as a means to gauge the purity of the motives of the various government officials who approved it."[3] *Id*. In fact, the majority in *Kelo* noted that though the city was "not confronted with the need to remove blight . . . their determination that the area was sufficiently distressed to justify a program of economic rejuvenation is entitled" to judicial deference. *Kelo*, 546 U.S. at 483.

As in their motion for a preliminary injunction, Plaintiffs resist this conclusion by relying primarily upon state court opinions that purport to rely on *Kelo*. But both cases involve interpretations of state constitutions, not the Fifth Amendment. For example, in *Rhode Island Economic Development Corp. v. The Parking Co.*, *L.P.*, the Rhode Island supreme court determined that, because a municipal corporation gained a significant financial benefit for itself

---

[3] Plaintiffs' reliance on *99 Cents Only Stores v. Lancaster Redevelopment Agency* is misplaced because, unlike here, the plaintiff made a showing that the taking was to bestow a private benefit. *See* 237 F. Supp. 2d 1123, 1129 (C.D. Cal. 2001) ("[T]he evidence is clear beyond dispute that Lancaster's condemnation efforts rest on nothing more than the desire to achieve the naked transfer of property from one private property to another."). In addition, the plaintiff challenged the public use determination itself because the determination that blight needed to be removed was unsupported. *Id*. Here, by contrast, there is no private benefit alleged, and there is no allegation that Defendant's public use determination is unsupported.

and its public use rationale was completely unsupported, the municipal corporation had engaged in an "arbitrary and bad-faith taking of private property that [the Rhode Island Supreme Court previously] condemned." 892 A.2d 87, 106 (R.I. 2006). But the "arbitrary and bad faith" test is a creature of Rhode Island eminent domain statutes and the Rhode Island constitution's definition of public use, not the Fifth Amendment. *See Romeo v. Cranston Redevelopment Agency*, 254 A.2d 426, 429, 432 & 434 (R.I. 1969) (analyzing whether "Article XXXIIII intended that the phrase 'blighted and substandard area' be given the same restrictive interpretation as our predecessors in 1949 gave to the term 'blighted area'[,]" answering no, but holding that redevelopment agencies cannot engage in the "arbitrary, capricious or bad faith taking of private property"). *City of Lafayette v. Town of Erie Urban Renewal Authority* likewise involved the interpretation of a state constitution, not the Fifth Amendment. *See* 434 P.3d 746, 750–52 (2018) (applying article XX of the Colorado constitution and determining whether Lafayette engaged in a bad faith taking).

  Plaintiffs also attempt to relitigate the import of three state court cases that they assert interpret the Fifth Amendment and argue that "the Supreme Court assumes that states are interpreting their constitutions in lockstep with the federal constitution unless they explicitly say otherwise." (Pl's Opp'n at 7–9 & n.4.) Setting aside that this Court determined that those cases are nonbinding, Plaintiffs ignore that "[s]tates [] impose 'public use' requirements that are stricter than the federal baseline." *Kelo*, 545 U.S. at 489 ("We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power."). It would be error to assume then that a state court's public use determination is based only on the federal constitution. Indeed, each of Plaintiffs' cases contain indications that the state court was interpreting its own constitution, not the Fifth Amendment. For example, in

8

*Earth Management, Inc. v. Heard County*, the Georgia supreme court clearly applied its own constitutional provisions because it did not cite the Fifth Amendment nor any federal court case interpreting it. *See* 248 Ga. 442, 446–47 (1981) (explaining that the case presented a "point of impact between two vital competing public interests. . . . [T]hat the state shall deprive no person of his property without due process of law and the principle that no private property shall be taken except for a public purpose." (citing only Constitution of Georgia, Art. I, Sec. III, Para I (Code Ann. § 2–301)). In *Pheasant Ridge Associates Ltd. Partnership v. Town of Burlington*, the Massachusetts supreme court stated: "Recognition in *our* cases that a bad faith land taking would be unlawful . . ." 399 Mass. 771, 777 (1987) (emphasis added).[4] This statement suggests reliance on state, not federal law. Finally, in *In re Opening Private Road for Benefit of O'Reilly*—a case that Plaintiffs argue establishes that the Pennsylvania supreme court interpreted the Fifth Amendment in *Middletown Township v. Lands of Stone*—the Pennsylvania Supreme Court does not clarify whether it relies upon the Fifth Amendment or its own constitution *See* 607 Pa. 280, 299 (2010) ("The constitutions of the United States and Pennsylvania mandate that private property can only be taken to service a public purpose [and] [t]his Court has maintained that, to satisfy this obligation, the public must be the primary and paramount beneficiary of the

---

[4] The Massachusetts court primarily relied upon Massachusetts cases to support the proposition, and then cited two federal cases that predate *Midkiff* and *Kelo*. *See Id.* at 776 (citing *Southern Pac. Land Co. v. United States*, 367 F.2d 161, 162 (9th Cir. 1966) and *United States v. Carmack*, 329 U.S. 230 (1946)). Both of these cases recognized only the possibility that the Fifth Amendment permitted a bad faith, arbitrary or capricious review when an official exercises taking power pursuant to delegated authority, such as an agency. Of course, since that time, the Supreme Court has never held that a public use claim permits such an inquiry, and as described above, has strongly suggested that it does not. Plaintiffs' reliance on *Heirs of Guerra v. United States*, 207 F.3d 763 (5th Cir. 2000) and *United States v. 58.16 Acres of Land*, 478 F.2d 1055 (1973) is similarly unhelpful because neither case considers *Midkiff*, both cases predate *Kelo*, and neither case came from the Second Circuit. Finally, *City of Las Vegas Downtown Redevelopment Agency v. Pappas*, 76 P.3d 1 (Nev. 2003), which predates *Kelo*, relied upon only Colorado and Oregon case law when it explained that "[c]ourts may not question the wisdom of how to accomplish the public purpose absent a showing of fraud or bad faith." 76 P.3d at 15 & n.69 (citing *Port of Umatilla v. Richmond*, 321 P.2d 338, 350–51 (Ore. 1958) (applying Oregon law); *Denver West Metro. Dist.*, 786 P.2d 434, 436 (Colo. Ct. App. Div. 3 1989) (applying Colorado law); *Thornton Dev. Auth. v. Upah*, 640 F. Supp. 1071, 1076 (D. Colo. 1986) (applying Colorado law)).

9

taking" (citations omitted)). The states' additional restrictions on the public use definition based upon their own constitutions and precedent are of no moment here because "[t]his Court's authority . . . extends only to determining whether [a] proposed condemnation [is] for a 'public use' within the meaning of the Fifth Amendment to the Federal Constitution." *Kelo*, 545 U.S. at 489.

Ignoring this Court's footnote in the preliminary injunction order, Plaintiffs argue that requiring a plaintiff to plead a private benefit here would allow the government to use eminent domain to punish political opponents or unpopular minorities. (Pl's Opp'n at 9–10.) They write at length regarding the story of Willa Bruce, a Black woman, whose successful business in Manhattan Beach was taken through eminent domain for a public park during the era of Jim Crow. (*Id.* at 10–12.) While Plaintiffs' concern for Black women is admirable, they can take solace in the fact that the Fourteenth Amendment provides sufficient protection of their right against a discriminatory state action, including a taking. *See 49 WB, LLC v. Village of Haverstraw*, 511 F. App'x 33 (2d Cir. 2013) (recognizing that a substantive due process challenge to a condemnation could be had if a plaintiff proves it "occurred under circumstances warranting the labels 'arbitrary and outrageous'" which are labels "associated with 'racial animus' or 'fundamental procedural irregularity'" (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999)).

Finally, Plaintiffs' complaint does not present a "fact pattern . . . in which the circumstances of the approval process so greatly undermine the basic legitimacy of the outcome reached that a closer *objective* scrutiny of the justification offered is required." *Goldstein*, 516 F.3d at 63 (emphasis in original). As in *Goldstein*, Plaintiffs "acknowledge[] the . . . rational relationship to . . . public use[.]" *Id*. at 62. And, Plaintiffs' claim of an impermissible purpose is

10

primarily based on "one or more of the government officials [being] actually—and improperly—motivated[.]" *Id*.  While Plaintiffs allege difficulties in obtaining a permit, their lack of knowledge about Defendant's plan to build a park, other available land for the park, and a statement from the Town Supervisor that nothing would be built on Plaintiffs' property, those allegations do not amount to anything more than the Town's desire to leave the plot of land undeveloped.  That is, Plaintiffs' allegations do not support an inference of a nefarious, improper motive necessitating "closer objective scrutiny."  *Id*.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.

                                            SO ORDERED.

Dated: Brooklyn, New York          /s/ LDH
September 30, 2022                   LASHANN DEARCY HALL
                                          United States District Judge